IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| MOUNTAIN COURTYARD SUITES,<br><br>Plaintiff,<br><br>vs.<br><br>JEFF WYSONG,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER<br>DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT<br>AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>FOR PUBLICATION<br><br>Case No. 2:18-cv-00752-HCN<br><br>Howard C. Nielson, Jr.<br>United States District Judge |

This case arises out of a failed commercial real estate transaction. After Defendant Jeff Wysong terminated a contract to purchase a property from Plaintiff Mountain Courtyard Suites ("MCS"), MCS sued Mr. Wysong for breach of both the express terms of the contract and the implied covenant of good faith and fair dealing. Both parties have moved for summary judgment. MCS's motion is denied. Mr. Wysong's motion is granted in part and denied in part.

**I.**

In February 2018, Mr. Wysong submitted an offer to purchase a commercial property from MCS and the parties executed a purchase agreement. *See* Dkt. No. 16-2. Mr. Wysong deposited $100,000 as earnest money into an escrow account in connection with the offer. *See id.* at 2. Section 2 of the agreement stated that the agreed-upon purchase price was $5,950,000 and specified that this purchase price would be paid with the $100,000 earnest money deposit,

$3,000,000 from a new loan, and $2,850,000 cash at settlement. *See id*. at 2. Section 8 of the contract provided that Mr. Wysong's "obligation to purchase under this Contract" was "conditioned," among other things, on Mr. Wysong's "approval of a physical condition inspection of the Property" and his "approval of the terms and conditions of any mortgage financing referenced in Section 2." *Id*. at 3. Addendum 1 to the contract, executed the same day, further provided that Buyer's offer was "subject to the buyer obtaining acceptable financing on or before May 1, 2018," and that "Buyer must remove all contingencies, including finance contingency in writing or this contract shall be deemed Null and Void." *Id*. at 8. Other relevant provisions of the purchase agreement will be discussed below.

On April 2, 2018, Mr. Wysong waived the physical-condition contingency in exchange for a $250,000 reduction in the purchase price. *See* Dkt. No. 16-3 at 6. On April 27, 2018, the parties extended the finance contingency by 30 days, made $10,000 of the earnest money deposit nonrefundable, and released this portion of the deposit to MCS. *See* Dkt. No. 16-4 at 2. On May 30, 2018, Mr. Wysong purported to issue a signed addendum to the purchase agreement stating that "[b]uyer hereby cancels contract due to being unable to obtain financing." Dkt. No. 16-5 at 3. The next day, Ralph Riedel, one of the brokers involved in the failed transaction, sent an email to another broker involved in the transaction as well as to the escrow agent. This email stated "[u]nfortunately, the condition of the property was in such disrepair that the buyer canceled the contract." Dkt. No. 16-8 at 2; *see also* Dkt. No. 16-7 at 93:1–25.

Approximately four months later, MCS sold the property to another buyer for $5,100,000. *See* Dkt. No. 16-6 at 29:11–16; Dkt. No. 16-9. MCS then initiated this action, claiming that Mr. Wysong had breached the express terms of the contract as well as the implied covenant of good faith and fair dealing. *See* Dkt. No. 2-2 at 7–8. In its Complaint, MCS states

that it seeks "liquidated damages in the amount of $90,000" as well as "general and consequential damages in an amount to be determined at trial," "costs and reasonable attorney fees," and "such other and further relief as the Court deems just and equitable." Dkt. No. 2-2 at 10. MCS's motion for summary judgment makes clear that it is seeking "general damages" of $600,000—the difference between the purchase price that it would have received from Mr. Wysong and the purchase price it ultimately received from another buyer. Dkt. No. 16 at 9–11. It is undisputed that MCS did not release its interest in the earnest money deposit before bringing this suit. *See* Dkt. No. 2-2 at 6, 33, 52; Dkt. No. 16-4 at 2; Dkt. No. 19 at 4. Both parties have moved for summary judgment. MCS moves for summary judgment on its claim that Mr. Wysong breached the express terms of the purchase agreement but not on its claim for breach of the implied covenant of good faith and fair dealing. *See* Dkt. No. 16. Mr. Wysong moves for summary judgment on both of MCS's claims. *See* Dkt. No. 19.

## II.

The court first addresses MCS's motion. MCS argues that Mr. Wysong breached the express terms of the purchase agreement by failing to apply for a loan in the amount of $3,000,000—the specific portion of the purchase price that Section 2 of the agreement provided would be paid with "a new loan." MCS maintains that Mr. Wysong also breached the purchase agreement by terminating it based on the property's physical condition despite waiving the physical-condition contingency in exchange for a $250,000 reduction in the purchase price. The court finds that MCS has failed to show that "there is no genuine dispute as to any material fact" and that MCS "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## A.

The court finds that MCS is not entitled to summary judgment on its claim that Mr. Wysong breached the express terms of the contract by seeking financing only in amounts well above $3,000,000. To be sure, Section 2 of the purchase agreement stated that $3,000,000 of the purchase price would be paid with "a new loan." Dkt. No. 16-2 at 2. But the court has been unable to locate any provision of the purchase agreement that required Mr. Wysong to apply for a loan in this precise amount or forbidding him from applying for a loan in a higher amount. To the contrary, the purchase agreement granted Mr. Wysong broad discretion in seeking financing. In addition to specifying the purchase price and the amount to be paid with a new loan, Section 2 also provided that "Buyer shall have the right to approve the terms and conditions of the new loan as provided in Section 8(f)"—which in turn stated that Mr. Wysong's "obligation to purchase under this Contract" was "conditioned upon Buyer's approval of the terms and conditions of any mortgage financing referenced in Section 2." *Id*. at 2–3. Significantly, Section 8 was titled "Buyer's right to cancel based on Buyer's due diligence"—thus indicating that buyer-approved financing was considered a matter of due diligence—and provided that "[i]f Buyer, *in Buyer's sole discretion*, determines that the results of Buyer's Due Diligence are unacceptable, Buyer may . . . cancel this Contract by providing written notice to Seller . . . ." *Id*. at 4 § 8.2 (emphasis added). Addendum 1 to the purchase agreement likewise stated that Mr. Wysong's offer was "subject to the buyer obtaining acceptable financing on or before May 1, 2018," and that "Buyer must remove all contingencies, including finance contingency in writing or this contract shall be deemed Null and Void." *Id*. at 8.

These numerous, seemingly discretionary provisions are difficult to reconcile with MCS's contention that the express terms of the contract required Mr. Wysong to apply for

4

financing in the specific amount of the new loan contemplated by Section 2 or otherwise tightly circumscribed his search for financing.[1] If, as MCS suggested at the hearing, *see* Sept. 18, 2019 Hearing at 5:30–6:20, Mr. Wysong's attempts to obtain financing only in amounts well exceeding $3,000,000 reflected a lack of good faith effort to effectuate the purchase, his failure to seek financing in the amount of the contemplated new loan may have violated the implied covenant of good faith and fair dealing—a claim on which MCS has not sought summary judgment. But it does not appear to have violated the express terms of the contract. And even if the express terms of the contract did require good faith efforts to obtain financing, Mr. Wysong offered testimony at his deposition that his approach to seeking financing was reasonable and complied with industry standards. *See* Dkt. No. 16-7 at 90:17–21; 96:3–21. This testimony creates a genuine issue of material fact sufficient to foreclose summary judgment for MCS.

**B.**

The court also denies MCS's motion for summary judgment on its claim that Mr. Wysong breached the contract by canceling based on the physical condition of the property. The only evidence MCS offers in support of this proposition is an email from Ralph Riedel to Tanner Riedel and the escrow agent stating that "[u]nfortunately, the condition of the property was in such disrepair that the buyer canceled the contract." Dkt. No. 16-8 at 2; *see also* Dkt. No. 16-7 at 93:1–25. It is far from clear, however, that Ralph Riedel had authority to speak for Mr. Wysong. The "confirmation of agency in this transaction" executed in connection with the purchase agreement lists Ralph Riedel and Tanner Riedel as broker agents for both the buyer and the seller. Dkt. No. 16-2 at 10. But Section 5 of the purchase agreement itself lists Ralph Riedel as

---

[1] Because Mr. Wysong has not moved for summary judgment on this issue, the court need not decide whether he is entitled to judgment as a matter of law on this point.

agent for the seller, and Tanner Riedel as agent for the buyer. *See id*. at 3. This is consistent with Mr. Wysong's deposition testimony that Tanner Riedel represented the Buyer and Ralph Riedel represented the Seller, though he also acknowledged that "it may be the other way around, I don't remember." Dkt. No. 16-7 at 93:07–94:18. Given that both brokers shared the same last name, such confusion is hardly surprising.

Even assuming that Ralph Riedel was authorized to speak for Mr. Wysong, his email to the escrow agent is directly contrary to the email sent by Tanner Riedel—who Section 5 of the purchase agreement and Mr. Wysong's deposition testimony indicate was Mr. Wysong's exclusive agent. Tanner Riedel's email to the escrow agent stated that "[t]he buyer has canceled the purchase agreement . . . due to being unable to obtain financing." Dkt. No. 16-5 at 2.

More important still, the purchase agreement provided that "[i]f Buyer, in Buyer's sole discretion, determines that the result of the Buyer's Due Diligence are unacceptable, *Buyer* may . . . cancel this Contract by providing *written notice* to *Seller* . . . ." Dkt. No. 16-2 at 4 § 8.2 (emphasis added). The purchase agreement did not contemplate termination by email from the broker to another broker and the escrow agent. And Mr. Wysong did provide formal written notice of termination to MCS—he issued a signed addendum stating that "[t]he Buyer hereby cancels contract due to being unable to obtain financing." Dkt. No. 16-5 at 3.

In light of this unambiguous written notice of cancellation, it is far from clear that Ralph Riedel's email to Tanner Riedel and the escrow agent suffices even to create a genuine dispute of fact regarding the reason for cancellation—especially given the question whether he had any authority to speak for Mr. Wysong at all and the contradictory email from Tanner Riedel. The court need not decide this question, however, since Mr. Wysong has not moved for summary judgment on this issue. Even if it is not dispositive, however, Mr. Wysong's written notice of

cancellation directly contradicts Ralph Riedel's email and more than suffices to create a genuine issue of material fact that bars summary judgment for MCS on this claim.

## III.

The court next turns to Mr. Wysong's motion. Mr. Wysong contends that MCS's claims are barred by its failure to release the earnest money deposit prior to commencing this litigation. As explained below, Mr. Wysong is entitled to summary judgment on MCS's claims to the extent MCS seeks relief other than a declaration that it is entitled to the $90,000 earnest money remaining in the escrow account. Because the court concludes that MCS's complaint can be construed to seek such a declaration, it grants Mr. Wysong's motion in part and denies it in part.

## A.

Section 16 of the purchase agreement provides as follows:

> **DEFAULT**. If Buyer defaults, Seller may elect either to retain the Earnest Money Deposit as liquidated damages, or to return it and sue Buyer to specifically enforce this Contract or pursue other remedies available at law. If Seller defaults, in addition to return of the Earnest Money Deposit, Buyer may elect either to accept from Seller a sum equal to the Earnest Money Deposit as liquidated damages, or may sue Seller to specifically enforce this Contract or pursue other remedies available at law.

Dkt. No. 16-2 at 5. Mr. Wysong maintains that pursuant to this provision, MCS's failure to release the deposit constitutes an election to claim the deposit as liquidated damages and bars it from seeking other remedies, such as the $600,000 difference between the purchase price contemplated by the contract and the price at which MCS ultimately sold the property. With one qualification, explained below, the court agrees.

Well-settled Utah law, which governs this diversity action, supports Mr. Wysong's argument. Provisions comparable (indeed, sometimes virtually identical) to Section 16 appear to be common in agreements to purchase real estate in Utah, and Utah cases interpreting such provisions "uniformly hold that before a seller may pursue a remedy other than liquidated

damages, the seller must release any claim to the deposit money." *Palmer v. Hayes*, 892 P.2d 1059, 1062 (Utah Ct. App. 1995); *see also*, *e.g.*, *Dowding v. Land Funding Ltd.*, 555 P.2d 957, 957 (Utah 1976); *Close v. Blumenthal*, 354 P.2d 856, 857 (Utah 1960); *McMullin v. Shimmin*, 349 P.2d 720, 721 (Utah 1960); *Andreasen v. Hansen*, 335 P.2d 404 (Utah 1959); *McKeon v. Crump*, 53 P.3d 494, 497–98 (Utah Ct. App. 2002).

The Utah Court of Appeals decision in *Palmer* is instructive. In that case, the defendants entered a contract to purchase the plaintiffs' house. *See* 892 P.2d at 1060. The contract required a $2000 earnest money deposit and provided that "[in] the event of default by buyer, seller may elect to either retain the earnest money as liquidated damages, or to institute suit to enforce any rights of seller." *Id*. at 1060–61 (modification in *Palmer*). After the defendants rescinded their offer, the plaintiffs sued for damages. *See id.* at 1061. The trial court granted summary judgment for the defendants on the ground that the plaintiffs had failed to release the earnest money before bringing suit. *See id.* The court of appeals affirmed, concluding that "by failing to release the deposit money, the [plaintiffs] elected to retain it as liquidated damages." *Id*. at 1062.

MCS argues that the rule articulated by these cases should not apply here because the earnest money deposit is held by an escrow agent and Mr. Wysong has not conceded default or released his interest in the deposit. MCS thus cannot simply retain the earnest money as liquidated damages but would likely need a judicial order to establish its right to the deposit. The plaintiffs in *Palmer* made essentially the same argument, however: "[t]he Palmers argue that, because Maple Hills Realty served as agents for both parties, the Palmers could not assert control over the disposition of the deposit." 892 P.2d at 1062. And the court rejected it: "[r]egardless of Maple Hills Realty's duties as escrow agent, the Palmers had an affirmative duty to release their interest in the deposit money to the Hayeses before they filed their suit for damages." *Id*. As the

8

court further explained, "[t]he Palmers . . . needed only to indicate to Maple Hills Realty, in writing, that they released the deposit money to the Hayeses. Then they could have proceeded with their suit for damages." *Id.* But "by failing to release the deposit money, the Palmers elected to retain it as liquidated damages." *Id*. *Palmer* thus makes clear that MCS's failure to release the earnest money before filing suit bars its suit to the extent it seeks "general damages" or any remedy other than the earnest money, even though the earnest money is held by an escrow agent and MCS cannot unilaterally retain it as liquidated damages.

**B**.

It does not follow that MCS cannot seek any remedy whatsoever. Section 16 of the purchase agreement allows MCS to "elect either to retain the Earnest Money Deposit as liquidated damages, or to return it and sue Buyer to specifically enforce this Contract or pursue other remedies available at law." Dkt. No. 16-2 at 5. As MCS notes, Mr. Wysong has not conceded default or released his interest in the deposit. MCS thus cannot simply retain the earnest money as liquidated damages. Rather, to obtain the earnest money, MCS will likely need a judicial ruling that Mr. Wysong has breached the purchase agreement.

Although by not releasing the interest money MCS forfeited its right "to specifically enforce this Contract or pursue other remedies available at law," MCS may still seek to establish its right to the earnest money deposit as liquidated damages. The court notes that MCS's prayer for relief requests not only "general and consequential damages in an amount to be determined at trial" but also "liquidated damages in the amount of $90,000" and "such other and further relief as the Court deems just and equitable." Dkt. No. 2-2 at 10. The court will construe the prayer for relief to include a request for a declaratory judgment that MCS is entitled to the $90,000 earnest money deposit as liquidated damages. *Cf. Dowding v. Land Funding Ltd.*, 555 P.2d 957, 957

(Utah 1976) (stating that where the plaintiff had not offered to return the earnest money deposit, his damages were limited to the deposit). Although the court grants summary judgment against MCS to the extent it seeks relief other than such a declaration, it will allow MCS to proceed to trial on its claims so that it may attempt to establish its right to the earnest money deposit.

**C.**

MCS argues that even if Section 16 of the purchase agreement bars it from obtaining any remedy other than the earnest money for Mr. Wysong's alleged breach of the express terms of the purchase agreement, it does not so limit the available remedies for Mr. Wysong's alleged breach of the implied covenant of good faith and fair dealing. The court rejects this argument.

The court sees no reason to treat the remedies available for a breach of the implied covenant of good faith and fair dealing differently from those available for a breach of the express term of the purchase agreement. "After all, the implied covenant is simply a term of the contract like any other." *Backbone Worldwide Inc. v. LifeVantage Corp.*, 443 P.3d 780, 785 n.4 (Utah Ct. App. 2019). It follows that "[a] violation of the covenant is a breach of contract," *Eggett v. Wasatch Energy Corp.*, 94 P.3d 193, 197 (Utah 2004), and "gives rise to a claim for breach of contract," *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 200 (Utah 1991). As MCS properly conceded at oral argument, its claim for breach of the implied covenant of good faith and fair dealing thus "sounds in contract." Sept. 18, 2019 Hearing at 30:05–32:00.

In arguing that Section 16 does not apply to its claim for breach of the implied covenant, MCS relies on the Utah Supreme Court's decisions in *Machan v. UNUM Life Ins. Co. of America*, 116 P.3d 342 (Utah 2005), and *Selvig v. Blockbuster*, 266 P.3d 691 (Utah 2011). In *Machan*, the Utah Supreme Court did distinguish between the available damages for breach of the implied covenant and the available damages for breach of express contractual terms. *See* 116

P.3d at 346. It did so, however, in the special context of insurance contracts, specifically rejecting "the traditional view of insurance contracts as commercial contracts for money," and emphasizing "the unique nature and purpose of an insurance contract." *Id*. at 345. The court declines to apply precedent from this specialized context to an ordinary contract for the purchase of commercial real estate.

In *Selvig*, the Utah Supreme Court did address a contract for the purchase of commercial real estate that included an election-of-remedies clause much like Section 16. That court did not, however, distinguish how that clause applied to the plaintiff's claim for breach of the express terms of the contract at issue there from how it applied to the plaintiff's claim for breach of the implied covenant of good faith and fair dealing. Instead, the *Selvig* court considered whether the clause applied at all to claims arising from a breach that it determined was not contemplated by the contract. *See* 266 P.3d at 697. As the court explained:

> The Contract does not contemplate, however, that Blockbuster could obtain the deed and record it without paying for the Property. Because the Contract did not contemplate that the buyers could obtain title to the property without full payment of the purchase price in the "form of collected or cleared funds," the parties could not have intended that the election of remedies provision could apply to a situation where the buyer recorded title to the Property without paying for it.

*Id*.[2] The *Selvig* court accordingly held that the trial court "erred in concluding that the election of remedies provision applied to bar the Selvig's claims for breach of contract *and* breach of the implied covenant of good faith and fair dealing." *Id*. at 696 (emphasis added).

---

[2] The court explained at length why such a breach was not contemplated by the contract:

> As with most standard real estate purchase contracts, the Contract provides for the creation of an escrow account and states that the deed can be recorded only after the purchase price has been "delivered to the escrow/title company in the form of collected or cleared funds." The contract further provides that the closing will occur when the "money required to be paid under these document[s] [has] been

11

*Selvig* thus provides no support for distinguishing between how Section 16 applies to MCS's claim for breach of the express terms of the contract and how that provision applies to its claim for breach of the implied covenant. In addition, the contract here plainly contemplated not only that Mr. Wysong might not obtain financing that he found acceptable but also that the parties might disagree about judgments relating to financing. As discussed above, the purchase agreement was expressly conditioned on Mr. Wysong's "obtaining acceptable financing." Dkt. No. 16-2 at 8 (Addendum 1); *see also id.* ("Buyer must remove all contingencies, including finance contingency in writing or this contract shall be deemed Null and Void."). In addition, the judgment whether available financing was acceptable was explicitly committed to Mr. Wysong's "sole discretion." *Id.* at 4 § 8.2; *see also id.* at 2 § 2 ("*Buyer* shall have the right to approve the terms of the new loan as provided in Section 8(f).") (emphasis added); *id.* at 3 § 8 ("Buyer's obligation to purchase under this Contract" is "conditioned upon *Buyer's approval* of the terms and conditions of any mortgage financing referenced in Section 2.") (emphasis added). Because the claimed breach here arises out of matters expressly addressed by the contract, the court finds that *Selvig*'s rule for breaches not contemplated by the contract does not apply. The court thus concludes that Section 16 applies to Plaintiff's claims both for breach of the express terms of the contract and for breach of the implied covenant of good faith and fair dealing.

\* \* \*

For the foregoing reasons, Plaintiff's motion for partial summary judgment is **DENIED**. Defendant's motion for summary judgment is **GRANTED** in part and **DENIED** in part.

**IT IS SO ORDERED**.

---

   delivered and the deed is recorded." Additionally, it provides that "Seller . . .
   agrees to convey such title" at closing.

*Id.* (modifications in *Selvig*).

DATED this 6th Day of April, 2020.

BY THE COURT:

Howard C. Nielson, Jr.
United States District Judge